MARY TERRY, EMPLOYEE, PLAINTIFF/APPELLEE v. PPG INDUSTRIES, INC., EMPLOYER, AND KEY RISK MANAGEMENT SERVICES, INC., CARRIER, DEFENDANT/APPELLANTS

No. COA02-342

(Filed 18 March 2003)

## 1. Workers' Compensation— ex parte contact with doctor— testimony and records excluded

Sections of a doctor's deposition testimony and records were excluded from a workers' compensation proceeding where there was ex parte contact between the doctor and defendant's safety manager. Although the doctor visited the plant once a week to see employees with work-related injuries and the conversation was not with defendant's attorney, the doctor's role was that of a treating physician and the protection of patient privacy and physician-patient confidentiality was involved. Finally, although plaintiff had stipulated to the medical records, she moved to exclude them prior to the hearing before the deputy commissioner and again before the full Commission, and the Commission determined that the ex parte contact rule had been violated.

## 2. Workers' Compensation— depression—licensed psychologist—testimony competent

Testimony from a licensed clinical psychologist about plaintiff's depression was competent in a workers' compensation proceeding.

## 3. Workers' Compensation— treatment not approved in advance—authorization sought within reasonable time

The Industrial Commission did not abuse its discretion by approving a psychologist's treatment of a workers' compensation plaintiff where the treatment was not approved in advance, but plaintiff moved for authorization within three weeks of the initial visit and two days of her second visit. The Commission also found that plaintiff's treating physicians had not provided successful relief for plaintiff's condition.

## 4. Workers' Compensation— depression—consequence of injury

The Industrial Commission's conclusion that the depression of a workers' compensation plaintiff was a direct and natural con-

TERRY v. PPG INDUS., INC.

[156 N.C. App. 512 (2003)]

sequence of her work injury was supported by its findings, which were supported by evidence concerning the psychological effects of plaintiff's chronic pain and the teasing and criticism she had endured at work.

**5. Workers' Compensation— surveillance video—disregarded**

The Industrial Commission did not err in a workers' compensation case by considering and then disregarding a surveillance videotape of plaintiff where the Commission concluded that defendant's agent had presented a skewed and incomplete video record to a doctor in an attempt to distort the doctor's view of plaintiff's truthfulness.

Appeal by defendants from Opinion and Award entered 1 August 2001 by the North Carolina Industrial Commission. Heard in the Court of Appeals 27 January 2003.

*Raymond M. Marshall for plaintiff-appellee.*

*Womble Carlyle Sandridge & Rice, by Philip J. Mohr, for defendant-appellants.*

EAGLES, Chief Judge.

PPG Industries, Inc. and Key Risk Management Services, Inc. ("defendants") appeal from an Opinion and Award of the Full Commission awarding Mary Terry ("plaintiff") total disability compensation and ordering defendants to pay for psychological or psychiatric treatment of the plaintiff. After careful consideration, we affirm.

PPG Industries, Inc. ("PPG") employed plaintiff for twenty-one years. At the time of her injury, plaintiff worked "running" a "warping chopper." On 18 September 1995, a "pin truck" struck plaintiff's left heel causing a contusion. The following day, plaintiff went to the emergency room where she was given medication and crutches to use for walking. Plaintiff saw Dr. Hunter Strader, Jr. ("Dr. Strader") on 3 October 1995. Plaintiff continued to suffer pain and Dr. Strader referred plaintiff to Dr. Jasper Simmons Riggan, III, ("Dr. Riggan") an orthopedic specialist. Dr. Riggan examined plaintiff and believed plaintiff suffered a partial tear of her achilles tendon. Dr. Riggan placed plaintiff in a fracture walker, a type of removable cast. Over the next several years, plaintiff still suffered pain along with involuntary muscle spasms in her lower left leg. Plaintiff was referred to several doctors during this time.

Defendants admitted plaintiff's right to compensation because of her 18 September 1995 injury and paid plaintiff temporary total disability benefits from 20 November 1995 until 25 February 1996 and from 17 June 1996 until 9 January 1997. From January 1997 until July 1997, plaintiff worked in a light duty job for PPG. Plaintiff still suffered pain and plaintiff's attorney referred her to a psychologist, Jerry Noble, Ph.D. ("Noble"). Noble saw the plaintiff on 30 June 1997. Noble diagnosed plaintiff with "major depression, single episode, without psychotic features." Noble examined the plaintiff again on 16 July and "recommended that she not work." Noble examined the plaintiff on 28 July and "recommended that [plaintiff] continue individual psychotherapy" and "consult a psychiatrist or a physician about psychotropic medications."

In early June 1997, plaintiff requested that her claim for permanent and total disability benefits be assigned for a hearing. The Deputy Commissioner heard the matter and concluded that the plaintiff was "released to perform light duty work, and the defendant provided work suitable to her restrictions" and that plaintiff is entitled to permanent partial disability compensation for a period of 14.4 weeks. The Deputy Commissioner further concluded and ordered that defendants pay for psychiatric expenses but that defendant "is not liable for the treatment by Jerry Noble, Ph.D., as said treatment was unauthorized." Plaintiff appealed to the Full Commission.

The Full Commission heard the case on 28 February 2001 and affirmed in part and reversed in part the Opinion and Award of the Deputy Commissioner. The Full Commission concluded that plaintiff was totally disabled and ordered that defendants pay total disability compensation until further order of the Commission and that defendants pay "all medical expenses incurred or to be incurred in the future including psychological or psychiatric treatment provided by and through Dr. Jerry Noble." Defendants appeal.

On appeal, defendants contend that the Full Commission erred in: (1) striking the testimony and stipulated medical records of Dr. Strader based upon his *ex parte* communication with the employer; (2) in finding that plaintiff remained disabled, and thereby justifiably refused employment, based solely on Jerry Noble's testimony; (3) in determining that plaintiff's disabling condition was a direct and natural result of her compensable injury; and (4) in failing to consider the video tape surveillance of plaintiff in evaluating the plaintiff's credibility. After careful consideration, we affirm.

**TERRY v. PPG INDUS., INC.**

[156 N.C. App. 512 (2003)]

"The standard of appellate review of an opinion and award of the Industrial Commission is limited to a determination of (1) whether the Commission's findings of fact are supported by any competent evidence in the record; and (2) whether the Commission's findings justify its legal conclusions." *Porter v. Fieldcrest Cannon, Inc.*, 133 N.C. App. 23, 25, 514 S.E.2d 517, 520 (1999). "If supported by competent evidence, the Commission's findings are binding on appeal even when there exists evidence to support findings to the contrary." *Ward v. Long Beach Vol. Rescue Squad*, 151 N.C. App. 717, 720, 568 S.E.2d 626, 628, *disc. review denied*, 356 N.C. 314, 571 S.E.2d 219 (2002). "This Court reviews the Full Commission's conclusions of law *de novo*." *Bowser v. N.C. Dep't of Corr.*, 147 N.C. App. 308, 311, 555 S.E.2d 618, 621 (2001), *disc. review denied*, 355 N.C. 283, 560 S.E.2d 796 (2002).

**[1]** Defendants first contend that the Full Commission erred in striking the testimony and stipulated medical records of Dr. Strader based upon his *ex parte* communication with the employer.

Defendants argue that *Salaam v. N.C. Dept. of Transportation*, 122 N.C. App. 83, 468 S.E.2d 536 (1996), *disc. review improvidently allowed*, 345 N.C. 494, 480 S.E.2d 51 (1997) is not applicable to the facts here because Dr. Strader was not a nonparty treating physician. Defendant also argues that the conversation was not with defendant's attorney and that it did not involve plaintiff's treatment. Defendant further argues that even if *Salaam* applies to strike Dr. Strader's testimony, the Full Commission should not have stricken stipulated medical records. We are not persuaded.

*Crist v. Moffatt*, 326 N.C. 326, 336, 389 S.E.2d 41, 47 (1990), held that "defense counsel may not interview plaintiff's nonparty treating physicians privately without plaintiff's express consent." "[T]he *Crist* rule precludes non-consensual *ex parte* communications during adversarial proceedings." *Salaam*, 122 N.C. App. at 88, 468 S.E.2d at 539. This Court in *Salaam* applied *Crist* to workers' compensation proceedings. *Id*. *Salaam* "conclude[d] the Commission erred by admitting Dr. Pritchard's deposition testimony in light of the non-consensual *ex parte* contact between NCDOT and Dr. Pritchard." *Id.* In reaching its determination, the Court noted the rationale behind the holding in *Crist* which included "patient privacy, the confidential relationship between doctor and patient, and the adequacy of formal discovery devices." *Id. See also Pittman v. International Paper Co.*, 132 N.C. App. 151, 155, 510 S.E.2d 705, 708, *aff'd*, 351 N.C. 42, 519 S.E.2d 524 (1999).

Here, Dr. Strader has been in private practice for thirty-six years and is "board certified in family practice." As part of an arrangement with PPG, Dr. Strader visits their plant once a week to see employees with work-related injuries. Dr. Strader first saw plaintiff on 3 October 1995 for her work-related injury. Dr. Strader saw plaintiff approximately twenty-four more times between 3 October 1995 and 29 July 1997 about her condition. Dr. Strader testified that while he "beg[a]n to take a back seat in terms of treatment," he would still:

> [S]ee people in this situation often enough to be sure that the plant understands what level of activity is reasonable to confirm with a consultant that the activities that have been assigned to the employee are reasonable in view of the problem that they may be having.
>
> And so at times I will talk with a consultant, be sure that we understand what they think is reasonable activity. And be sure that their medications are being renewed appropriately, to be sure they're keeping their appointments with the consultants, and getting the tests done as ordered.

Plaintiff's counsel asked Dr. Strader if it would "be a fair statement" that he was clearly "not treating [plaintiff] as a patient?" Dr. Strader responded that "I can't say that because I was reviewing her medicines and her consultations and her complaints as I do with any patient that I see. So I think I was involved in that, although her primary care was being received from other physicians." Upon inquiry as to whether his "relationship with employees that [he saw] at the plant [was] any different from [his] physician/patient relationship with patients [he saw] in [his] office," Dr. Strader responded "[f]rom my standpoint, no, there is none." Based on the evidence, Dr. Strader's role with the plaintiff is that of a treating physician. While the plaintiff became a patient of Dr. Strader because of his "arrangement" with PPG, the "considerations of patient privacy" and "the confidential relationship between doctor and patient" still exist.

Defendants argue that Dave Ulmer, manager of safety and plant protection at defendant PPG, not defendants' attorney, talked with Dr. Strader and that the discussion was not about plaintiff's condition. Ulmer requested the surveillance of plaintiff. Ulmer met with Dr. Strader and showed him a surveillance videotape of plaintiff taken without her consent. The tape showed the plaintiff walking in "closed-toe" shoes with heels. Dr. Strader was asked whether he recalled having a conversation with Ulmer after watching the video-

tape. In response, Dr. Strader testified that "[y]eah. I told him I was absolutely shocked, because my impression of [plaintiff] from the very beginning had been that this was a significant injury and I had certainly taken all of her statements to me at face value. And I was— I was shocked to see the film, and I told him about it." In response to a question about the purpose of watching the video, Dr. Strader testified that "I would assume that—I did assume that this was information which would add to my knowledge of the patient's degree of disability." Dr. Strader further testified that:

Q. So you-all talked about what you were going to talk to her—

A. Yeah.

Q. What you were going to do in your appointment with her?

A. Exactly. And part of that was that I was not comfortable in discussing the video or confronting her with that. I did not think that was appropriate, but that I did think for my information it was helpful to know whether she had been wearing shoes other than just on that particular day.

. . . .

A. We had not had a long discussion about how we were going to trick this lady into answering questions the way we want her to prove her guilt. We had a very brief conversation after I viewed the video and the conclusion whether it originated in my mind or his was it would be helpful to me and to them to know whether, you know, she had been wearing these shoes or not. Obviously, if she denies it this creates real problems in their mind and in my mind when they have her on video wearing it.

Here, the evidence shows that Dave Ulmer, an employee of defendant PPG, showed plaintiff's treating physician, a videotape of plaintiff walking. Ulmer and Dr. Strader then discussed questioning plaintiff about the type of shoes she had been wearing. The evidence also showed that Dr. Strader "assume[d] that this was information which would add to my knowledge of the patient's degree of disability." The involvement of Ulmer and his conversation with Dr. Strader involves the "considerations of protecting patient privacy, the confidential relationship between physician and patient and 'the untenable position in which *ex parte* contacts place the nonparty treating physi-

cian,' " *Pittman*, 132 N.C. App. at 155, 510 S.E.2d at 708 (citation omitted), which *Salaam* protects.

The Full Commission also struck Dr. Strader's medical records that involved the plaintiff following the *ex parte* contact. Defendants argue that the plaintiff stipulated to these medical records and cannot later seek their exclusion. We do not agree.

Here, the plaintiff moved to exclude those records prior to the hearing before the Deputy Commissioner. In plaintiff's application for review to the Full Commission, the plaintiff assigned as error the Deputy Commissioner's denial of the motion to exclude those records. The Full Commission determined that the *ex parte* contact between Ulmer and Dr. Strader violated *Salaam*. Accordingly, the Full Commission struck those sections of Dr. Strader's deposition testimony and the medical records which involved the plaintiff that occurred after the *ex parte* contact.

Because "[i]n a workers' compensation case, a physician may not engage in *ex parte* communications with the defendant," *Reinninger v. Prestige Fabricators, Inc.*, 136 N.C. App. 255, 261, 523 S.E.2d 720, 724 (1999), this assignment of error is overruled.

**[2]** Next, defendants contend that the Full Commission erred in relying on Jerry Noble's testimony to find that plaintiff remained disabled and thereby justifiably refused employment.

Defendants argue that the Full Commission erred in accepting the testimony of Noble. First, defendants cite *Martin v. Benson*, 125 N.C. App. 330, 481 S.E.2d 292 (1997), *rev'd on other grounds*, 348 N.C. 684, 500 S.E.2d 664 (1998) as support for the argument that Noble could not provide competent testimony "about whether plaintiff could return to work based upon her pain" because he is a psychologist and not a medical doctor. Second, defendants argue that Noble was not an authorized physician when he gave his testimony so the Full Commission should not have accepted his opinion. Defendants argue that plaintiff failed to prove that she sought or gained approval from the Industrial Commission for treatment by Noble. We do not agree.

"[T]he opinion testimony of an expert witness is competent if there is evidence to show that, through study or experience, or both, the witness has acquired such skill that he is better qualified than the jury to form an opinion on the particular subject of his testimony." *Maloney v. Hospital Systems*, 45 N.C. App. 172, 177, 262 S.E.2d 680,

683, *disc. review denied,* 300 N.C. 375, 267 S.E.2d 676 (1980). "The qualifications of a medical expert are judged according to the same standards as those of expert witnesses in general: The common law . . . does not require that the expert witness on a medical subject shall be a person *duly licensed to practice medicine." Id.* at 178, 262 S.E.2d at 683 (quoting 2 Wigmore on Evidence § 569, pp. 667-68 (3d ed. 1940)) (emphasis in original). Here, the defendants stipulated that Noble was a licensed clinical psychologist. As a licensed clinical psychologist, Noble's testimony regarding the cause of plaintiff's depression is competent. *But see Martin,* 125 N.C. App. at 337, 481 S.E.2d at 296 (holding that the trial court erred in allowing a neuropsychologist to testify that an accident did not cause the plaintiff to suffer a closed head injury).

**[3]** Defendants also argue that Noble's opinion should not be given any weight because he was not an authorized physician at the time of his testimony.

"Although an employer that has accepted an employee's injury as compensable generally has the right to direct the medical treatment, this right is not unlimited." *Lakey v. U.S. Airways, Inc.,* 155 N.C. App. 169, 173, 573 S.E.2d 703, 707 (2002). "[A]n injured employee may select a physician of his own choosing to attend, prescribe and assume the care and charge of his case, subject to the approval of the Industrial Commission." G.S. § 97-25. "[T]he injured employee need not seek approval for a physician's services prior to the treatment." *Ruggery v. N.C. Dep't of Correction,* 135 N.C. App. 270, 276, 520 S.E.2d 77, 82 (1999). "The employee's request for approval may even be filed after the treatment has been procured, just as long as the request is filed within a reasonable time thereafter." *Kanipe v. Lane Upholstery,* 141 N.C. App. 620, 626, 540 S.E.2d 785, 789 (2000). "Approval of an employee-selected physician is left to the sound discretion of the Commission." *Id.* "This Court will disturb the Commission's determination on this issue only upon a finding of manifest abuse of discretion." *Lakey,* 155 N.C. App. at 174, 573 S.E.2d at 707.

Here, the plaintiff saw Noble on 30 June 1997 because she "felt depressed" and suffered "crying spells" and "physical pain." Plaintiff saw Noble again on 16 July and 28 July. Plaintiff moved to allow psychological treatment and to have Noble's treatment approved by the Industrial Commission on 18 July 1997. The Industrial Commission denied plaintiff's motion by order filed 12 January 1998 but did state that "[p]laintiff may request a hearing if she continues to contend that

she is in need of psychological treatment." Plaintiff moved for authorization within three weeks from her initial visit with Noble and two days after her second visit. Plaintiff's request was made within a reasonable amount of time after she began treatment with Noble. Further, the Full Commission found that:

> Although plaintiff did not receive authorization from either defendant or the Industrial Commission for this treatment, the undersigned note that the only physician plaintiff was still seeing at this time was Dr. Strader, and neither Dr. Strader nor any of the other physicians who had provided plaintiff with treatment had successfully effected a cure or provided relief for her condition.

The Full Commission also found that:

> The record in this case contains a letter dated 14 July 1997 from defendant's then-counsel, G. Thompson Miller to Ms. Phyllis Brookbank of Key Risk Management Services, in which Mr. Thompson states that plaintiff's counsel called him seeking approval for Dr. Noble to be designated as plaintiff's treating physician. Mr. Thompson forwarded the request to Ms. Brookbank with the recommendation that the request be denied. There is no further reference to this issue in the record. Based on the evidence of record, plaintiff timely requested that defendant authorize Dr. Noble as plaintiff's treating psychologist prior to or shortly after 30 June 1997. There is no evidence of defendant's response. Dr. Noble's treatment of plaintiff is authorized.

Competent evidence supports these findings which in turn support the conclusion to have defendants pay for plaintiff's treatment by Noble. The Full Commission did not abuse its discretion in approving Noble's treatment. This assignment of error is overruled.

[4] Defendants contend that the Full Commission erred in determining that plaintiff's disabling depression was a direct and natural result of her compensable injury. We do not agree.

Defendants argue that the Full Commission's findings of fact and the testimony of Noble do not support the conclusion that the plaintiff's injury caused her disabling depression. Defendants argue that the plaintiff's disabling depression was the result of her co-employees' "teasing, criticizing and accusing her of faking her physical problems."

The Full Commission made the following findings:

30. Dr. Noble diagnosed plaintiff with major depression, due at least in part to her work-related injury. There was some question as to whether the death of plaintiff's husband several years earlier contributed to the level of plaintiff's depression; however, Dr. Noble stated that plaintiff's depression most clearly rested on the occupational injury and the circumstances at work.

31. On 16 July 1997, plaintiff returned to Dr. Noble. She stated at that time that the job she was performing at work required her to stand, that she could not stand on a protracted basis, and that there were no sitting assignments available to her. Plaintiff related that she had been subject to teasing and criticism at work specifically accusing her of faking her physical problems, and that she had received the same reactions from management. These incidents caused plaintiff great embarrassment, and further complicated her depression. For these reasons, Dr. Noble recommended that plaintiff not return to work.

Based on these findings, the Full Commission concluded that "[a]s a result of her injury by accident, plaintiff suffers from disabling depression which is a direct and natural consequence of her work injury and is therefore compensable."

In response to a question seeking his opinion as to the cause of plaintiff's depression, Noble testified that "[t]he most important factor is her occupational injury." Further, Finding 31 states that the "teasing and criticism" plaintiff received at work *further complicated her depression.*" (Emphasis added). In addition to Noble's testimony, Dr. Strader testified that the plaintiff suffered chronic pain as a result of her foot and leg problems and that chronic pain has a psychological effect on people. Dr. Strader further testified that he "certainly felt that [plaintiff] was somewhat depressed as I think almost anyone would be because of the persistence of her problem." The testimony of Noble and Strader is competent evidence to support the Full Commission's findings of fact which in turn support its conclusion that plaintiff's depression is a "direct and natural consequence of her work injury." This assignment of error is overruled.

[5] Defendants contend that the Full Commission erred in failing to consider the video tape surveillance of the plaintiff in evaluating plaintiff's credibility. We do not agree.

"Before making findings of fact, the Industrial Commission must consider *all* of the evidence. The Industrial Commission may not discount or disregard any evidence, but may choose not to believe the evidence *after* considering it." *Weaver v. American National Can Corp.*, 123 N.C. App. 507, 510, 473 S.E.2d 10, 12 (1996) (emphasis in original).

Here, the Full Commission examined the record and made the following finding:

23. Dave Ulmer, defendant's director of safety and plant protection, ordered video surveillance of plaintiff. On 17 December 1996, without the knowledge or consent of plaintiff, Mr. Ulmer showed a portion of the video lasting a few minutes to Dr. Strader, in which plaintiff was seen walking in shoes with heels of one to one and one half inches, for approximately half a block to and from her car at the funeral of a relative. According to Dr. Strader, plaintiff was not limping. Dr. Strader testified that the purpose of Mr. Ulmer showing him the tape was to cast doubt upon the extent of plaintiff's injury and her representation of the level of her disability. Dr. Strader's opinions were tainted by defendant's ex parte communication with him. Following their viewing of the video tape, Dr. Strader and Mr. Ulmer discussed plaintiff's veracity regarding her condition.

The Full Commission then concluded that "[t]he evidence of record demonstrates that the agent of defendant presented a skewed and incomplete video record to Dr. Strader in an attempt to distort his view of plaintiff's truthfulness, and that the attempt was successful." The Full Commission considered the video tape evidence and concluded to disregard it. This assignment of error is overruled.

Accordingly the Opinion and Award of the Full Commission is affirmed.

Affirmed.

Judges McCULLOUGH and ELMORE concur.